UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 22-139 (DSD/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **DEFENDANT'S POSITION** |
| vs. | ) | **REGARDING SENTENCING** |
| | ) | |
| DENIS VLADMIROVICH[1] MOLLA, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

On October 11, 2022, Mr. Molla pled guilty to *Wire Fraud*, in violation of 18

U.S.C. § 1343.[2]  Mr. Molla found himself deeply invested in politics and the massive

political divide that overwhelmed the United States in 2020 and 2021.  He was in a

heated argument with people on the other end of the political spectrum, which ignited an

illogical idea to commit this illicit act.  While there are no excuses for his conduct, Mr.

Molla deeply regrets his crime and subsequent lies.  No sentence will compare to the

punishment Mr. Molla has inflicted upon himself and his family, as well as the deep

regret and guilt he continues to feel.

Mr. Molla has been fully compliant on pretrial release and reports to his

supervising officer as directed (ECF No. 37, ¶ 4).  He has also already paid the $100

---

[1] Mr. Molla's middle name is spelled "Vladimirovich."
[2] The Court may remember that Mr. Molla was very emotional and embarrassed at the plea hearing.  His remorse was sincere.

special assessment and the $83,494.34 restitution in full.[3]  As explained below, Mr. Molla

is employed, he is involved with his community, and he remains close with his family.

For the reasons set forth below, Mr. Molla, by and through his attorney, Ryan Garry, asks

this Court to sentence him to probation.

## LEGAL STANDARD

The law on sentencing is well-settled.  The Court is first to resolve any factual and

legal disputes related to the PSR, calculate the statutory minimum and maximum

sentences, and determine the corresponding sentencing guidelines range.  *United States v.*

*Feemster*, 572 F.3d 455, 460–61 (8th Cir. 2009).  Next, the Court is to consider if a

departure from the guidelines range is warranted.  Finally, the Court is tasked with

deciding whether a variance is necessary as it must impose a sentence that is "sufficient,

but not greater than necessary" to achieve the statutory sentencing objectives. 18 U.S.C. §

3553(a).

## NO ADDITIONAL PSR OBJECTIONS

Mr. Molla has no outstanding PSR objections (ECF No. 35) and no reply to the

government's objection (ECF No. 34).

## PENALTIES

This offense carries no mandatory minimum sentence, with a maximum of 20

years in prison (ECF No. 27, p. 5).  The parties and the PSR agree that the United States

Sentencing Guidelines establish a base offense level of 7, a 12-level increase due to the

---

[3] Proof of payment is attached.  Because Mr. Molla has already paid restitution, he will ask that he pay no fine.

amount of loss, a 2-level increase due to the number of victims, a 2-level increase due to a conscious or reckless risk of death or serious bodily injury, a 2-level increase due to obstruction of justice, and a 3-level reduction for acceptance of responsibility (ECF No. 27, pp. 6–7; ECF No. 37, ¶¶ 27–38).  With a criminal history category I and an adjusted offense level 22, Mr. Molla faces a guidelines range of 41–51 months in prison (ECF No. 27, p. 7; ECF No. 37, ¶¶ 43, 68).

## THE OFFENSE CONDUCT

The plea agreement establishes that Mr. Molla set fire to his property and staged it so it would be blamed on the political left (ECF No. 27, pp. 2–3).  He then submitted insurance claims and received money from donors via GoFundMe still claiming others committed the arson (ECF No. 27, pp. 3–4).  While he initially denied any involvement to law enforcement, he eventually came clean and admitted to FBI agents that he had started the fire and was thus not entitled to the insurance money or donations (ECF No. 37, ¶ 16).  His confession was emotional and honest.

As shown in the PSR, Mr. Molla deeply regrets his actions (ECF No. 37, ¶¶ 16, 17, 22, 23, 24).  He, like most of the country, was worn down from COVID lockdowns and political disagreements (ECF No. 37, ¶ 22).  He also struggled with his relationship with his daughter and his own COVID-19 illness (ECF No. 37, ¶¶ 22, 24).  The combined emotional and mental distress contributed to his poor decision to commit the crime (ECF No. 37, ¶ 24).  He wanted to make a statement that the political left—who he saw as attacking his own political beliefs—was no better than the political right (ECF No. 37, ¶

22).  As he acknowledged in the PSR, his actions proved him to be worse than both political sides (ECF No. 37, ¶ 22).

Mr. Molla makes absolutely no excuses for his conduct.  While he likely would not have ordinarily gone to such extremes had he been as emotionally and mentally strong as he usually is, he fully admits to his conduct.  He offers his sincere apologies to the Court and victims, and he is relieved to have paid full restitution.

## BACKGROUND

Mr. Molla was born in Ukraine in 1992 (ECF No. 37, ¶ 46).  His parents had moved to Ukraine from Moldova to start a church (ECF No. 37, ¶ 46).  His family immigrated to the United States in 1997 (ECF No. 37, ¶ 46).  Living in Boston, Mr. Molla started learning English in elementary school (ECF No. 37, ¶ 47).  His parents worked hard; his mother cleaned houses, and his father worked in remodeling (ECF No. 37, ¶ 47).  When Mr. Molla was 10 years old, the family moved to Minnesota due to cheaper housing, a demand for construction workers, and a large Baptist church community (ECF No. 37, ¶ 47).  He is the oldest of four children (ECF No. 37, ¶ 48).  He sees his parents as role models and looks to their loving relationship; he also remains close with his siblings (ECF No. 37, ¶ 49).

While he became rebellious and somewhat lost in middle and high school, Mr. Molla turned his life around at age 18 due to a religious conversion (ECF No. 37, ¶ 49).  In fact, Mr. Molla's brother cites Mr. Molla as inspiration for his own religious conversion (ECF No. 37, ¶ 51).

Mr. Molla graduated high school in 2011 and attended some college classes (ECF No. 37, ¶ 58). He found he did better with hands-on work, and so he went into construction like his father and grandfather (ECF No. 37, ¶ 58).

Mr. Molla met his wife in high school, and their relationship strengthened his spirituality (ECF No. 37, ¶ 50). They married in 2013 (ECF No. 37, ¶ 50). Mr. Molla and his wife yearned for a family but struggled with infertility (ECF No. 37, ¶ 50). After a mission trip to Africa where church members prayed for them, they became pregnant and now have three young children with a fourth child on the way (ECF No. 37, ¶ 50). They could not be happier.

Mr. Molla has been very active in his church, as described in the attached support letters. G.M., Mr. Molla's mother, writes that "he played the saxophone in the church band, he was involved in the youth choir, he was active in youth services and events, he even led a few events himself. He led a bible study in his home for many years and then became a Sunday school teacher. He wants to set a good example for his kids to be raised in church." Y.K., Mr. Molla's sister-in-law, writes, "He volunteered weeks of his time to build Bethany Baptist Church in Brooklyn Center. He spent several weeks in South Africa, leading a project in rebuilding an orphanage." A.T., Mr. Molla's friend, writes, "During my families' two year service as missionaries in South Africa, Denis and his wife came to visit. They were a huge help and a blessing to the community. His wife spent two weeks doing teeth cleanings for the community with little to no rest. Denis helped at the mission with construction needs."

As demonstrated by his background, Mr. Molla's actions in this case are completely out of character.  Mr. Molla's brother "has come to believe that Molla was 'having a battle in his soul' [during the offense] and wrestled with his actions before he ultimately gave in to his emotions" (ECF No. 37, ¶ 51).  Since then, Mr. Molla has focused on his family (ECF No. 37, ¶ 51).  His brother asks for a sentence of probation due to Mr. Molla's wife and children's need to have him present (ECF No. 37, ¶ 51).  Mr. Molla's wife stated that since the offense, Mr. Molla has completely changed his behavior and is focused on her and their children (ECF No. 37, ¶ 52).  She "believes this was an uncharacteristic mistake by a good father and husband, and she hopes the Court will see that he is trying to make up for what he did" (ECF No. 37, ¶ 52).  She is "very dependent" on him as he is financially responsible for their family (ECF No. 37, ¶ 52).[4]

## ARGUMENT

A term of "imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).  A sentence must "fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  After consideration of all the mitigating factors in this case, a sentence of probation is sufficient to satisfy the statutory purposes of sentencing in this case.

---

[4] Regarding a fine, the PSR notes that Mr. Molla's positive net worth is "tied up in home equity, and he has limited access to liquid funds. . . . [I]t should also be noted that Molla is the sole financial provider for his wife and children, and imprisonment in this case would significantly impact their finances as well" (ECF No. 37, ¶ 66).

## I.     Mr. Molla's 3553(a) Factors Warrant a Probationary Sentence.

### A.  The Nature of the Offense

This case is not the typical wire fraud or arson case; this offense was politically driven and committed during an emotional and challenging period in Mr. Molla's life. Mr. Molla was upset by the political climate and what he saw as attacks against his political beliefs.  He made a horrible decision: he set fire to his own property and made it look like the political left had done it.  He regretted it instantly.

The fire grew out of control.  Given his mental state, regret, and embarrassment, he could not confess his conduct at that time, and the situation snowballed.  To avoid suspicion, he filed insurance claims and took donations via GoFundMe.  As he got deeper into his lie, he saw fewer and fewer ways out.  He initially lied to law enforcement but eventually confessed to FBI agents.  He then pled guilty in federal court to a felony. When he was finally able to pay restitution, he felt relieved to pay back the victims.  He still feels immensely guilty and wants to continue atoning for his errors.

### B.  Mr. Molla's Characteristics

By all accounts, Mr. Molla is a kind, intelligent man.  His communication with the undersigned throughout this case has been pleasant, patient, and polite.  He has made no excuses for his conduct.  He has taken full responsibility and is remorseful for his choices and actions in this matter.  From the beginning, he repeatedly asked the undersigned when he could pay restitution.  This was a constant question until finally he was able to do so after his guilty plea.  He felt terrible for what he did to the generous people who

donated their money.  The PSR notes, "By all accounts, he is a loving and supporting parent and husband, and the instant offense appears to be a deviation from his otherwise law abiding life" (ECF No. 37, ¶ 84).

### C.  The Need for Deterrence

While it is important to deter crime, any prison sentence Mr. Molla receives will have limited impact in his particular case.  Said another way, prison has little <u>specific</u> deterrent value given the consequences he has suffered thus far, particularly with the fact that he has no counted criminal history.  "Prison is an important option for incapacitating and punishing those who commit crimes, but the data show *long prison sentences do little to deter people from committing future crimes*" (emphasis added).[5]  Evidence suggests "that short sentences may be a deterrent.  However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect." [6]

First, research has shown that *being caught* is more of a deterrent than *punishment*.[7]  Simply being caught and indicted is more of a deterrent to both Mr. Molla and others than a long sentence.  Second, prison sentences do not particularly deter future crime: "Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[8]  Third, rather than punishment, any police presence that increases the chance of being caught is more of a

---

[5] U.S. Department of Justice, National Institute of Justice, Five Things About Deterrence 2 (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.
[6] Id.
[7] Id. at 1.
[8] Id.

deterrent than punishment.[9]  Longer sentences can increase recidivism.[10]  Fourth,

increasing penalties does not generally deter crime because criminals often do not know

what the penalty is for the crime they are committing.[11]  It makes sense that people do not

research the statutory sentencing and sentencing guidelines before committing a crime.

Therefore, increasing penalties is not going to deter crime—it merely fills the prisons and

eats up taxpayers' dollars.

> This is especially true for Mr. Molla.  The PSR states:

> Molla has no incarceration history, and as such, the prosecution alone and
> the fact of imprisonment as a possible outcome may already have had a
> deterrent effect. Molla has also already paid all restitution in this matter, and
> while this does not absolve him from necessary punishment, it is a marked
> step that demonstrates his acceptance of responsibility. This officer does not
> intend to diminish the severity of the offense, which endangered Molla's
> family as well as others in the neighborhood, but it may bear consideration
> that, now that the GoFundMe and insurance victims have been made whole,
> Molla himself is bearing the full brunt of the loss in this case, that being
> $300,000 in damages from the fire he set. A defendant who is also, ultimately,
> the monetary victim of his own actions is a unique factor that may distinguish
> it from other fraud cases that also fall within the same advisory guideline
> range of imprisonment.

(ECF No. 37, ¶ 84).

## II.    Other Reasons for a Probationary Sentence for Mr. Molla.

> The Supreme Court provides guidance in sentencing discretion:

> Although the sentencing judge is obliged to consider all of the sentencing
> factors outlined in section 3553(a), the judge is not prohibited from including
> in that consideration the judge's own sense of what is a fair and just sentence
> under all the circumstances. That is the historic role of sentencing judges,

---

[9] Id.
[10] Id.
[11] Id.

and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness.

*United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S. at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*Pepper v. United States*, 562 U.S. 476, 487–88 (2011).  In this case, a probationary sentence is fair and just.

First, Mr. Molla's case has been all over the news, and he has embarrassed his friends and family.  Everyone knows what he was accused of and now his admission.  He has spoken with church leaders about the offense and has wanted to share far more than the undersigned would allow.  While he is relieved that he has been able to pay restitution, he will forever be branded by his conviction.

Second, Mr. Molla is 30 years old, and he has no counted criminal history.  He has five traffic citations only (ECF No. 37, ¶ 42).  "It may *very often* be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."  *United States v. Edwards*, 595 F.3d 1004, 1016, n.9 (9th Cir. 2010) (citation omitted).  For someone with no substantive criminal

history, any terms of probation will be onerous and will certainly be a sufficient punishment for Mr. Molla.

Third, regardless of sentencing, Mr. Molla will have a federal felony conviction on his record.  "The stigma of a felony conviction is permanent and pervasive."  *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982).  This will affect Mr. Molla in obtaining housing, getting a job, volunteering, and so on.  "Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed."  *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

Fourth, the likelihood that Mr. Molla "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence."  *Pepper*, 562 U.S. at 492.  This offense is a complete deviation from Mr. Molla's character.  He let his emotions get the better of him.  He disclosed to the undersigned that he felt sick about his actions afterwards.  The situation, then, snowballed because he did not want to admit to what he did.  He was ashamed.  Being convicted in federal court of a felony is a sufficient punishment for Mr. Molla.  Outside of this case, Mr. Molla has been a productive member of society, and he will continue to be so.

Finally, society will shoulder a massive financial burden to incarcerate Mr. Molla.  A guidelines sentence could cost society $151,214.83 to $188,096.50 if Mr. Molla is sent to prison (*see* ECF No. 37, ¶ 78).  Society will benefit far more if Mr. Molla can remain home and maintain employment to support himself and his family.

For all of these reasons, a probationary sentence is sufficient in this case.

### III.   Mr. Molla's Acceptance of Responsibility.

Mr. Molla has accepted full responsibility in this case.  He pled guilty to the offense as requested by the government and spoke to the PSR writer about the case.  As summarized by the PSR:

> He provided to the undersigned the same account provided to law enforcement and in the written e-mail to the friend that started the GoFundMe campaign. Molla stated that he was struggling to bond with his new daughter and experiencing other stressors related to the COVID-19 lockdowns that were enacted in 2020. Following a political argument on a jobsite with one of his customers and a similar argument with the customer's son, he struggled feeling like he was not allowed to voice his opinion (offense materials confirm a disagreement in September, which was followed by an apology to Molla on September 16, 2020, and Molla's response to that apology on September 22, 2020). He denied that he wanted to blame the graffiti and arson on this individual, but in his mind, burning his Trump flag would somehow demonstrate that he and others with similar political beliefs were not as bad as he was being made to feel. Looking back, Molla admits that his actions not only failed to make the statement he intended but proved him to be worse than both political sides had behaved.

(ECF No. 37, ¶ 22).

After he confessed to investigators on July 6, 2021, he provided consistent reports of his crimes to others (ECF No. 37, ¶¶ 16, 17, 22, 23, 24).  On July 6, 2021, he told investigators, "I didn't expect fire to just . . . it like exploded, it was so loud, and just, all over the place . . . it was so quick . . . everything's on fire, I was panicking because it grew from something small into something super huge . . ." (ECF No. 37, ¶ 16).

On July 13, 2021, he sent an email to his friend, which showed his clear crisis of conscious and inner battles:

> Was walking before I did this and had many second thoughts to not do this. I even sat there behind the Camper for like 30min just fighting myself inside to not do anything but I [innocently] thought that it's just a flag I'm burning

and spraying something on garage doors. . . . Hands shaking with fear. . . .
my first reaction to all this was fear of what will happen to Me and My Family
if everyone finds out.  I started crying and asking for forgiveness out loud.
The more I thought what would happen to My Family, the more I wanted to
keep it in and hid this terrible thing I did.  I felt very sick, empty, and fearful.
I vomited a few times.  Was shaking and couldn't get hold of myself. . . . I
realized that I am a terrible person and am no better than any 'party' out there
because I am acted worse then them all.  As the lie grew the more I started to
realize how bad this is and I don't want to get caught so that my Family
doesn't suffer for my mistake.  I had to convince with my actions and speech
that I'm the victim.  It was very very very painful to receive money from
people because I knew I was at fault here. . . . I felt that I had to go along
with it so that I would not get caught.

(ECF No. 37, ¶ 23).  The below letters of support also show that Mr. Molla has given

consistent confessions to family and friends.

## IV.    Support from the Community.

Mr. Molla has considerable support from his family and community.  Attached are

21 support letters, some of which are quoted here.  All the letters express disbelief that

Mr. Molla committed the instant offense but describe his immense regret, and they ask

that he not be imprisoned away from his wife and children, who fully rely on him.

D.M., Mr. Molla's wife, writes:

The events of September 23rd, 2020, still haunt me to this day. Never in my
wildest dreams did I think that someone I loved and cared for so much would
do something like this. I would have died defending his honor because in my
mind, there was absolutely no way Dennis would do anything like this. Since
hearing his confession, I have had a very hard time dealing with the
consequences of his actions that now involve me and my children. The news
stories, the intense hate from everyone, the angry messages, the death threats,
and so on. My faith was so shaken, and I was so incredibly angry. I spent
many nights crying and asking God why He would put me and the kids
through something so terrible. But throughout my entire grieving process,
my husband was there to cry with me. He was there begging me to forgive
him over and over again, he was there hugging our children and asking them
to pray for us to always be together, and he was there promising us that once

13

this was over, things were going to be different. I told him that the best apology is changed behavior, and I can positively say that he has dramatically changed in the last few months. The things that used to trigger him before, don't trigger him anymore. He has a lot more patience for the children, even when there is utter chaos and overstimulation all around. Things could be completely falling apart when I am at home with the kids, but as soon as Dennis walks through the door after work the kids run to meet him and melt into his arms. Their whole personality and mood changes when he is around. They need their father. I am utterly terrified at the thought that they may not see him for a few years. At this point in our lives, I am completely dependent on him. After our third baby was born, I had to leave my job as a dental hygienist and place all financial burden on him so I could care for our children. I am so scared that I will have to miss the best years of their lives and have to rely on someone else to raise them, just so I can work to keep a roof over our heads. Now that we have another child coming in July of 2023, I have absolutely no idea how I am going to be able to do life without him. The people that will suffer the most with Dennis's incarceration are me and the children.

Your Honor, I am begging you to take this into consideration when you are sentencing my husband. Though I strongly believe in justice and agree that with any crime should come punishment, I also believe in the power of forgiveness and second chances. Please consider giving my husband a sentence that does not involve incarceration, and a second chance to provide and be there for his family.

V.B., Mr. Molla's pastor, writes:

He came to me quite soon after he was notified about the investigation of his crime. He confessed about that and was deeply regretful about his actions. While it was hard for me to believe his confession, because this was so out of character for Dennis, I accepted his confession and told him immediately that he needs to do everything that he can to correct the wrongs that he had done. Again, Dennis was very regretful and humble when he realized the enormity of the consequences for his actions.

Dennis promised that he would do his best in order to correct the wrongs that he did and was very serious about it. He took all the steps to correct his actions and he willingly accepted my pastoral rebuke and discipline. The discipline measures included stepping away from any leadership involvement in the church and abstaining from church communion participation until the matter becomes resolved. . . .

14

. . . I also ask for your grace and mercy in making the final decision in Dennis' case.  When you come to the sentencing of Dennis, I ask that you grant him the opportunity to remain with his family and not imprison him.  I do believe that he understood the tragedy of his terrible mistakes, he took all the needed steps in attempt to fix the situation, and that the community interests would be served best by avoiding his incarceration.  He needs to take care of his family, working honestly to provide food for his children, and taking time and attention to raise them to be good citizens.  Again, I ask for your kind consideration of this matter.

V.L., Mr. Molla's father-in-law and a Hennepin County Sheriff's Office Deputy, writes:

[Dennis is a] hard working, selfless person with a kind heart; to hear of these actions from Dennis were shocking, because the character described resembles nothing of the Dennis we all know.  When Dennis told us of this situation, he spoke with sorrow and disgust of himself with apologies repeated over and over with tears. . . . Your Honor, please have mercy on Dennis and let him stay with his family!

D.K., Mr. Molla's brother-in-law, writes:

In our many conversations, he was always honest and open about what he was going through, despite being embarrassed about it, and it was encouraging for me to hear how he battled and pushed through his hardships. . . . I remember the day when Denis called my wife and I to open up about the mistake he made.  He was extremely ashamed and yet, I was surprised to hear him being so open.  He was humiliated by his actions and was worried that this news would affect us all the way in California – he apologized profusely because he thought that our friends would not accept us because of him.  I have never seen a person in his shame remain so open.  He didn't want to hide and he would repeat 'don't be like me' – he wanted others to learn from his mistakes, again displaying the honesty and openness that I was always drawn to.

D.M., Mr. Molla's brother, writes:

The current situation that Dennis is in was unexpected.  When I found out, it was hard for me to believe because it does not line up with who Dennis is.  When Dennis confessed to what he did, he felt very ashamed.  He was crying, apologizing, and feeling very regretful.  He told us he confessed to his wife, his pastor, our family, and his wife's family.  This showed me that he regrets his actions.

## **CONCLUSION**

Pursuant to 18 U.S.C. § 3561(c)(1), Mr. Molla is eligible for 1 to 5 years of

probation (ECF No. 37, ¶ 73).  Probation must include a fine, restitution, or community

service (ECF No. 37, ¶ 73).  Mr. Molla has already paid restitution in full and has no

objection to providing community service as part of his probationary term.  While the

guidelines do not suggest probation (ECF No. 37, ¶ 74), they are advisory and not

mandatory.

For the foregoing reasons, Mr. Molla respectfully requests that this Court sentence

him to probation and impose no fine.


Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**


Dated:   February 10, 2023                          s/ Ryan Garry

Ryan P. Garry (Attorney No. 0336129)
Attorneys for Defendant
333 South Seventh Street, Suite 3020
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com